**UNITED STATES, Appellant,**

v.

**Elwood C. ANDERSON, Appellee.**

**No. 80–774.**

District of Columbia Court of Appeals.

Argued Jan. 13, 1981.

Decided Aug. 31, 1982.

---

Keith A. O'Donnell, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. at the time of argument, John A. Terry and Constantine J. Gekas, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

Edwin C. Brown, Jr., Washington, D. C., for appellee.

Before NEWMAN, Chief Judge, KELLY, Associate Judge, and GALLAGHER *, Associate Judge, Retired.

* Judge Gallagher was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 27, 1981.

KELLY, Associate Judge:

A two-count indictment was filed on June 6, 1979, charging appellee Elwood C. Anderson with assault, D.C. Code 1973, § 22–504, and obstruction of justice, D.C. Code 1973, § 22–703, for deliberately kicking an arrestee, Gregory O. Akers, and subsequently obstructing investigation of the incident. The government appeals from a pretrial order suppressing all evidence obtained in the investigation of an allegation of police misconduct following the giving of an immunized statement by appellee to his superiors.

On September 12, 1978, appellee and Officer Warren Alexander arrested Gregory O. Akers for driving without a license. When the officers discovered narcotics on his person, Akers, while handcuffed, fled. The officers gave chase and found Akers hiding under a porch behind an oil tank. According to a third officer, Leonard Campbell, who was also present at the scene, appellee ran up to Akers and deliberately kicked him in the stomach after he had been pulled from beneath the porch and while he was still on the ground. Officer Campbell's report of the incident to his superior led to an

investigation by the Metropolitan Police Department's Third District. On September 13, 1978, appellee was asked to make a statement but chose to exercise his right to remain silent. Akers was interviewed on September 15, and gave a statement exonerating appellee by explaining that the contact was accidental. Other officers present at Akers' arrest denied seeing the incident. The information and reports thus obtained were forwarded to the United States Attorney's Office for possible criminal prosecution. They were returned to the Third District on September 26, 1978 with a memorandum from the Deputy Chief of the Grand Jury intake section saying that the matter was determined to lack prosecutive merit.

The next day, appellee was reinterviewed. Following a "Reverse Garrity" warning,[1] he first gave a narrative statement (September 27) and on September 28, answered specific questions which were transcribed in a separate statement. In both statements appellee denied any deliberate assault and testified that he had fallen after running and only accidentally slipped into the arrestee.[2] On October 3,

1. This phrase derives from the case of *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), in which the Supreme Court found that it was a violation of the Fifth Amendment guarantee against self-incrimination to compel police officers to testify where refusal to do so would cost them their jobs. The "Reverse Garrity" warning informs the employee that while a refusal to testify might have disciplinary or employment consequences, neither the statement itself, nor fruits of the statement will be used against him in any criminal proceedings. The warning given to appellee on September 27, reads:

    Inasmuch as no criminal charges will be preferred against you, coupled with the fact that this matter is still being actively investigated from an administrative standpoint, it now has become mandatory that I administer a *Reverse* Garrity warning to you.
    At this time, I am going to require you to furnish me a statement, in addition to questioning you about the allegations made against you by Officer Leonard J. Campbell of the Third District. Briefly, Officer Campbell alleges that on Tuesday, September 12, 1978, you kicked a prisoner, Gregory O. Akers, while he was handcuffed and being held by two other police officers. This question-

    ing concerns administrative matters relating to the official business of the Police Department. I am not questioning you for the purpose of instituting criminal charges and prosecution against you. During the course of this questioning, even if you do disclose information which indicates that you may be guilty of criminal conduct, neither your self-incriminating statements nor the fruits of any self-incriminating statements you make will be used against you in any criminal legal proceedings.
    Since this matter is an administrative matter and any self-incriminating information you may disclose will not be used against you in a court of law, you are required to answer my questions fully and truthfully. This requirement is set forth in Metropolitan Police Department General Order Number 1202.1, Part 1, Section F6, and in section 2.1:5 of the Metropolitan Police Department Manual. If you refuse to answer my questions, this in itself is a violation of the rules of the Department, and you will be subject to disciplinary penalties.

2. Officer Anderson said, *inter alia*, that he was not aware that his foot had struck anything when he slipped, that if he had run into the

the Third District authorities entered a finding of "not sustained," indicating insufficient evidence to prove the allegations of Officer Campbell.[3] On October 18, the matter was assigned to Sergeant Francisco Tadle in the Internal Affairs Division of the police department, the branch which investigates personnel matters.

At the suppression hearing, Sergeant Tadle testified that in conducting the investigation, he reviewed the jacket of the case, attempted to reinterview the other officers present at the scene of Akers' arrest, visited the scene of the alleged assault and finally contacted Akers after numerous unsuccessful attempts to do so. Akers agreed to give another statement and on December 1, 1978, he related a new version of the incident. In narrative form,[4] Akers stated that appellee had deliberately kicked him in the stomach on September 12, while he was lying on the ground, handcuffed. Akers also explained that within a few days after the incident, appellee contacted him, indicating that he, appellee, was in trouble and that he would appreciate it if Akers said nothing. Appellee then gave Akers his business card. After Akers made his initial statement to the Third District investigators alleging that the contact was accidental, he called appellee in Occoquan, Virginia, to arrange a meeting. The two met and Akers showed appellee a copy of his statement. They discussed code names by which they would refer to each other and appellee's code name was written on back of the statement. To corroborate Akers' second statement, the police investigators obtained

from him appellee's business card and Akers' copy of his first statement. Sergeant Tadle testified that scientific fingerprint analysis revealed appellee's prints on Akers' statement. Tadle also testified at the suppression hearing that telephone company records confirmed Akers' toll call to appellee following the making of his first statement.

In ruling on appellee's motion to suppress, the trial judge expressed a concern that no evidence had been presented by the government regarding the police department's motives in continuing the investigation and in interviewing Akers after a finding of "not sustained" by the Third District investigators and a decision not to prosecute by the United States Attorney's Office. He also found that from the way Akers was questioned at the time of his second statement, it was obvious that "knowledge gained from the statement of [appellee] was used." The court was also persuaded to rule as it did because there was lacking any evidence "that they were going to go back to [reinterview] Akers under any circumstances."

On June 18, 1980, the court suppressed appellee's statements and all subsequently obtained evidence,[5] holding that the government had not carried its burden to affirmatively prove that the evidence upon which it proposed to prosecute appellee was derived from a legitimate source wholly independent of appellee's compelled testimony, pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).[6]

---

prisoner it was an accident, and that he could not be absolutely sure that he had not made contact, but since Officer Campbell was accusing him of kicking the prisoner he had to assume he had made some contact (September 27). He said, further, that he couldn't be sure no contact was made, but he did not feel any, and that he was not absolutely sure what happened (September 28).

3. Sergeant Francisco Tadle explained at the suppression hearing that the finding of "not sustained" is not as conclusive as a finding of "unfounded" which is used to indicate that a charge was completely erroneous.

4. In response to a question as to what happened after he was stopped by the police on the date in question, Akers gave a narrative statement of ten pages. The remaining twenty pages of his statement consisted of questions and answers about the alleged assault and the subsequent attempt to obstruct justice.

5. This included all statements by Akers made after September 27, 1978, as well as his live in-court testimony, the business card, the telephone records, Akers' copy of his first statement and the fingerprint analysis.

6. "Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom ... prohibits the prosecu-

To reverse, we must find this ruling to be plainly wrong or without evidence to support it. D.C. Code 1973, § 17–305(a).

▮ While the government carries a "heavy burden of proving that all of the evidence it proposed to use was derived from legitimate independent sources" once a defendant shows that he testified under a grant of immunity, *id.* at 461–62, 92 S.Ct. at 1665, a review of the government's evidence at the suppression hearing reveals that his burden was met and that the finding to the contrary was plainly wrong.[7]

The government's burden was met by testimony and proffers of evidence presented at the suppression hearing. Sergeant Tadle explained that the Internal Affairs investigators succeeded in contacting Akers in the courthouse on November 27, 1978. The encounter on that date was brief but Akers indicated to Tadle and his colleague that he had initially given a false statement in exchange for appellee's cooperation in other matters and that he was willing to talk to the police again. Because Akers' identity was known to the police from the time the report was first made by Officer Campbell, he was a preexisting independent source of information. In continuing the investigation, it was a natural and obvious step for the Internal Affairs investigators to seek Akers out again.

▮ The trial court held that the government should have made a showing of the authorities' subjective motivation in continuing the investigation and reinterviewing Akers. But prosecutorial motives are not probative of whether the evidence sought to be introduced was obtained from a legitimate independent source or whether the compelled testimony was used as an investigative lead or that it focused the investigation on appellee.[8] Appellee's Fifth Amendment protections do not depend "upon the integrity and good faith of the prosecuting authorities." *Id.* at 460, 92 S.Ct. at 1665. The inquiry is a more objective one, concerned with the source of the incriminating evidence sought to be introduced and whether it was obtained independently of the compelled testimony. In *Counselman v. Hitchcock,* 142 U.S. 547, 586, 12 S.Ct. 195, 206, 35 L.Ed. 1110 (1892), the Supreme Court struck down an immunity statute because it did not prohibit "that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party." This language indicates that the evil to be avoided is that the prosecuting authorities will gain affirmative information from the substance of the compelled testimony.

In the instant case, where the government's evidence shows that appellee's statement was both suspect and exculpatory, an inquiry into the subjective thinking of the prosecuting authorities would be especially meaningless. The most that could be shown would be that the investigators disbelieved appellee's statement. But that would not establish improper use of appellee's testimony in view of the government's evidence at the suppression hearing.

▮ The possibility that appellee's statements were used as an investigative lead is ruled out by the government's proof that the testimony is suspect and exculpatory. The prosecution's theory is that appellee deliberately kicked Akers and that he later

---

torial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Kastigar v. United States, supra* at 453, 92 S.Ct. at 1661 (emphasis in original).

7. We agree however that the compelled testimony itself would be admissible in a prosecution for perjury or false swearing. *See United States v. Apfelbaum,* 445 U.S. 115, 126, 100 S.Ct. 948, 954, 63 L.Ed.2d 250 (1980) ("perjury prosecutions are permissible for false answers to questions following a grant of immunity").

8. [The] total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "investigatory lead," and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures. [*Kastigar v. United States, supra,* 406 U.S. at 460, 92 S.Ct. at 1664; footnote omitted.]

unlawfully influenced Akers to deny the incident. Appellee's statements of September 27 and 28 deny any deliberate assault and do not even hint at the existence of a cover up or any post-arrest contact between Akers and appellee. This contrasts with the compelled testimony given in *United States v. Warren,* D.C.App., 373 A.2d 874 (1977), which supplied investigators with two pieces of information leading them to the incriminating evidence. In *Warren,* the appellant's statement mentioned his ownership of a white convertible and the appearance of an old man with barking dogs at a crime scene. The police connected Warren to various rapes by means of these comments. Here appellee gave no new information to the investigators, thus no leads could have been developed from his testimony.[9]

Moreover, the compelled testimony did not cause the investigation to focus on appellee because appellee had always been the subject and focus of the investigation. The Second Circuit Court of Appeals rejected a similar claim where the appellant, who testified under a grant of immunity before a state grand jury, had been "the subject of a continuing intelligence division investigation" by the Internal Revenue Service, even though the initial investigation had been closed because of "insufficient evidence to warrant prosecution." *United States v. Bianco,* 534 F.2d 501, 510 (2d Cir.), *cert. denied,* 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). Here, Sergeant Tadle testified that the purpose of the continuing investigation was to establish whether appellee had assaulted Akers. Tadle also testified that he would have "made inquiries on Mr. Akers' [first] statement" that the assault was accidental, regardless of whether he had appellee's compelled testimony.[10] Moreover, appellee's immunized statement was neither mentioned nor presented to Akers, according to Tadle's responses on direct examination. Thus even assuming the Internal Affairs Division investigators disbelieved appellee's statements, the statements were not the means by which they focused their investigation on appellee or the reason they decided to prosecute.[11] The fact that appellee might have been suspected of lying, just as the fact that he was suspected of having assaulted Akers, do not of themselves establish any direct or indirect use of the compelled testimony.

The case cited by this court in *Warren, supra,* and upon which the trial court relied, *United States v. McDaniel,* 482 F.2d 305 (8th Cir. 1973), is distinguishable factually from the present case. In *McDaniel,* a federal prosecutor had read three volumes of incriminating state grand jury testimony before indictments were filed against the appellant. The Eighth Circuit upheld post-trial quashing of the indictment because the grand jury testimony might have been used "in some significant way short of introducing tainted evidence." Since the appellant had fully confessed his criminal activity to the state grand jury, it was reasonable to assume that the testimony might have been "used" indirectly in focusing the investigation, deciding to prosecute or in planning

---

**9.** In *United States v. Jones,* 542 F.2d 186, 201 (4th Cir. 1976), the Fourth Circuit upheld the denial of a motion to suppress evidence as derived from immunized testimony, stating:

> Nor, for that matter, was there anything in [appellant's] state grand jury testimony that would have provided any new information or "investigative leads" either to the state investigating units or the federal authorities. It is obvious from a reading of [appellant's] testimony that he grudgingly provided only information which he knew was already available to the authorities.

**10.** The trial court incorrectly found that "there is no evidence whatsoever, not a shred submitted to the court, that they were going to go back to Akers under any circumstances."

**11.** Although false statements would be an act in furtherance of appellees' alleged scheme to obstruct justice, the investigator's focus on the obstruction offense could not have arisen until they had spoken to Akers, who was an independent source of evidence. Similarly, any decision to prosecute for either obstruction or assault would not have been made until the incriminating evidence was obtained from Akers. *Thus, the court incorrectly concluded that appellee's statement was impermissibly used in the decision to prosecute.*

trial strategy, such as cross-examination. No such assumption is possible in this case because appellee's testimony is devoid of any helpful or incriminating evidence. The government has adequately shown that appellee's conviction does not depend on the statements given on September 27 and 28. The danger that appellee "could not possibly [be] convicted" in the absence of his compelled testimony, is not present here, as it was in the first case in which the Supreme Court dealt with the constitutionality of use immunity. *Counselman v. Hitchcock, supra,* 142 U.S. at 564, 12 S.Ct. at 198.

In *United States v. Romano,* 583 F.2d 1, 8 (1st Cir. 1978), the Court of Appeals, in finding that the government's evidence was obtained independently of immunized testimony, remarked that "moreover there was nothing to suggest that the government needed [appellant's] testimony to help make out its case." The same thing could be said here, even though at the time appellee's testimony was given, the government did not yet have knowledge of the incriminating evidence, but only of its source, Gregory Akers. Nor would a conviction for obstruction of justice depend on evidence of false testimony because Akers' December 1 statement established a prima facie case of obstruction regarding appellee's conduct during the first week of the investigation.

The government met its burden at the suppression hearing of establishing that Akers' December 1 statement and all subsequently obtained evidence were derived from its independent knowledge of Akers' identity and not from appellee's compelled testimony. The court's finding that appellee's statements were used in obtaining the incriminating evidence was plainly wrong and the order of suppression must be

*Reversed.*[12]

NEWMAN, Chief Judge, concurring:

I join in Judge Kelly's opinion for the court. I write separately only to make one additional point. It is that immunized statements would be admissible in a prosecution for obstruction of justice alleging that those statements contained willful "misrepresentation" undertaken "to obstruct, delay, or prevent the communication to an investigator of the District of Columbia government by any person of information relating to a violation of any criminal statute."[1] D.C.Code 1981, § 22–703.

In *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), the Supreme Court held that one may be prosecuted for perjury or false swearing committed in an immunized statement. A principal underlying rationale is that the privilege against self-incrimination is meant to protect one from adverse consequences of testimony as to *prior* crimes, and not to facilitate false testimony prospectively. The use immunity is coextensive with the constitutional privilege. Therefore, immunity does not prevent the use of those statements in a prosecution for a crime committed by virtue of the statements themselves, as opposed to prior crimes to which they may refer. While *Apfelbaum* involved a prosecution for perjury, there is no plausible basis for treating any differently obstruction of justice committed in the course of an immunized statement. Although three Justices found it necessary to disassociate themselves from some possible implications of the majority opinion,[2] the entire

---

12. The government's claim that the court improperly refused to consider supplementary affidavits from investigative personnel need not be considered because we have rested our decision on the court's incorrect view of the evidence with which it was presented.

1. The opinion of the court notes that the statements would be admissible in a prosecution for perjury or false swearing, but does not address the subject of this concurrence. *See supra* p. 450 note 5.

2. In particular some Justices disapproved the possibility of using statements to establish perjury committed at some point other than during the immunized statement itself. *United States v. Apfelbaum, supra* at 132–33, 100 S.Ct. at 957–58 (Brennan, J., concurring in the judgment), 133, 100 S.Ct. at 958 (Blackmun, J., concurring in the judgment).

Court appears to accept both the premise that use immunity does not confer a de facto privilege to lie, and the conclusion that, if the lie constitutes a crime, the statement can be used to show its commission.

> [N]either the immunity statute nor the Fifth Amendment preclude [sic] the use of respondent's immunized testimony at a subsequent prosecution for making false statements, so long as that testimony conforms to otherwise applicable rules of evidence. [*United States v. Apfelbaum, supra* at 131, 100 S.Ct. at 957.]

> [The Fifth Amendment] permits an individual to refuse to answer questions; but it does not give him the right to answer falsely. [*Id.* at 132, 100 S.Ct. at 957 (Brennan, J., concurring in the judgment) (citations omitted).]

> The privilege operates only to protect the witness from compulsion of *truthful* testimony of an incriminating nature. Perjury or the making of false statements under a grant of immunity thus violates a basic assumption upon which the privilege and hence the immunity depend. [*Id.* at 135, 100 S.Ct. at 959 (Blackmun, J., concurring in the judgment).]

As there is no apparent ground relevant to admissibility for distinguishing an immunized false statement constituting the crime of perjury from one constituting the crime of perjury from one constituting criminal obstruction of justice pursuant to § 22–703, the statements here in issue would be admissible in a prosecution for the latter crime.

GALLAGHER, Associate Judge, Retired, dissenting:

There is more to this case than one would gather from the majority opinion. Not only does the court brush aside the trial court's considered findings of fact as being clearly erroneous, but even more seriously it shows an unconcern for the important constitutional issue in this case. When the facts and the issues are penetrated, it is evident that if this decision stands the defendant in this case will be denied the legal protection afforded other criminal defendants.

According to appellee, while transporting the complainant (Officer Campbell) to the Mayor's house, the appellee (Officer Anderson) observed Gregory Akers operating an automobile in the vicinity of 12th & U Streets, N.W. Officer Alexander and Officer Caldwell were also in the police cruiser at the time. Because he had arrested Akers, a narcotics trafficker, before, appellee knew Akers' driver's license had been suspended.[1] On the basis of that information, appellee stopped Akers' automobile and placed him under arrest. During a search of Akers' person, appellee discovered a small bag containing narcotics. After attempting to grab the bag away from the officer, Akers fled. The police gave chase into an alley behind the 1300 block of U Street where they eventually found Akers hidden beneath a porch and behind an oil tank. Officer Campbell later made the charge that as the fugitive (Akers) was being pulled from behind the oil tank by one of the other officers, appellee intentionally kicked him. Appellee has asserted that he was attempting to neutralize the fugitive and that any contact he may have had with his foot was accidental.

An investigation of the alleged assault was conducted by the Police Department's Third District. On September 13, 1978, appellee asserted his Fifth Amendment right and declined to answer questions concerning the arrest. On September 15, Akers gave a statement to Lieutenant Giles, the officer who conducted the investigation for the Third District, indicating that he had not been intentionally kicked, but rather that appellee had inadvertently fallen into Akers as he approached to assist in making the arrest. Officers Alexander and Caldwell told Third District investigators that they had not seen appellee kick Akers. On September 21, 1978, a memorandum was sent by Joseph B. Valder, the Deputy Chief of the Grand Jury Intake Section of the United States Attorney's Office which concluded that "after a thorough evaluation of

---

1. Akers said in his statement of December 1, 1978, that he had been arrested by appellee in 1977 and that appellee had later testified at Akers' probation revocation hearing.

the allegations against the subject officer involving an assault occurring on September 12, 1978, we have determined that this matter lacks prosecutive merit. Accordingly, this matter is being referred to you for whatever administrative action you consider appropriate."

On September 27, 1978, Lieutenant Giles warranted to appellee that the criminal investigation was over, no charges would be preferred, but that an administrative police investigation was in progress and this required him to order that his account of the incident be given,[2] terming this a reverse *Garrity* warning.

As a result of Lieutenant Giles' representations to him, appellee agreed to forego his constitutional right and be interrogated. He explained that he had slipped and fallen as he approached Akers as he was being captured. In addition, he made the following admission, "but I couldn't be absolutely sure that I had not made contact, but since Campbell was accusing me of kicking the prisoner I had to assume that I had made some contact with the prisoner." This statement tends to establish an assault and it is incriminatory. On an assault charge, it leaves for resolution only whether the admitted blow was accidental or deliberate.

On October 3, 1978, a memorandum was sent by the Third District's investigative team to the Chief of Police which concluded that the allegations against appellee were "not sustained." But later, on October 18, 1978, another investigation was instituted and this time the case was assigned to Sergeant Tadle of the Police Department's Internal Affairs Division "to be reinvestigated." Sergeant Tadle was given a case file which included a copy of appellee's compelled statement under immunity and the finding of the earlier investigation.

Sergeant Tadle spoke briefly with Akers (the alleged victim) on November 28, and then reinterviewed him at length several days later. In a statement dated December 1, 1978, Akers gave a different account of the arrest and told Sergeant Tadle that he believed he had been kicked intentionally and that appellee had spoken to Akers the next day urging him to tell police investigators that any contact occurring at the time of the arrest had been accidental. Akers asserted that in exchange appellee promised to "help him out" with the drug charge that had resulted from Akers' September 12, 1978, arrest. Thereafter, on June 6, 1979, a two-count indictment was returned by the grand jury charging appellee with assault and obstruction of justice. The alleged assault and the alleged communication which formed the basis for the obstruction of justice charge, both pre-dated the immunity. Assertedly, there was contact with Akers both before and after the immunized statement by appellee.

Appellee's motion to suppress evidence procured by the government and statements made by appellee on or after September 27, 1978, was filed and a thorough evidentiary hearing was held. At the hearing in the trial court, the examination of Sergeant Tadle (the government's only witness) focused largely on whether appellee's immunized statement had triggered the subsequent investigation. The trial court compared Akers' December 1, 1978, statement with appellee's prior compelled statement of September 27, 1978, and found

that the knowledge gained from the statement of Mr. Anderson was used. I find that as a fact, the way the questions were asked about the stumbling, the falling, and all you have to do is read it and it jumps right out at you, and it just jumped right out at me that it is intertwined, and I find inalterably wedded in this document as a factual matter.

Sergeant Tadle testified that this incident was "reinvestigated" by the Internal Affairs Division for the purpose of "corroborating" appellee's immunized version of the facts surrounding Akers' arrest. The sergeant stated that after being assigned the case he reinterviewed Akers to determine the truth of appellee's compelled statement.

2. *Garrity v. State of New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

The trial court concluded that the December 1, "statement of Acres [sic] ... is replete with the fact that investigative use was made of Officer Anderson's statement." It also found that the compelled statement became the cornerstone of the second investigation. The court granted the defendant's motion to suppress.

## I.

This case bristles with questions stemming from the constitutional protection on compelled testimony and the scope of an immunity grant in return for compelled testimony. The court here does not show its usual solicitude on this constitutional issue. Ordinarily, the court is careful to hold the government to the line on a promise to a defendant which causes her or him to surrender a constitutional protection.[3] In this area of criminal procedure in a recent case this court has gone so far as to say not only will we require strict compliance by the government in the matter of such agreements with defendants, but we will "construe any ambiguity against the government." *White v. United States*, D.C.App., 425 A.2d 616, 618 (1980).

In this case, the police lieutenant began by making this official promise to his underlying officer (appellee, the defendant):

[A]n in depth investigation has been undertaken and in accordance with matters of this nature, all reports and statements gathered to date were presented to the United States Attorney's Office for possible criminal prosecution.

On Tuesday, September 26, 1978, a memorandum was received from Mr. Joseph B. Valder, Deputy Chief of the Grand Jury Intake Section wherein he advises that after a thorough evaluation of the allegation made against you, it has been determined that *this matter lacks prosecutive merit.*

*Inasmuch as no criminal charges will be preferred against you,* coupled with the fact that this matter is still being actively *investigated from an administrative standpoint,* it now has become mandatory that I administer a *Reverse* Garrity warning to you.

At this time, I am going to require you to furnish me a statement, in addition to questioning you about the allegations made against you by Officer Leonard J. Campbell of the Third District....

*Since this matter is an administrative matter and any self-incriminating information you may disclose will not be used against you* in a court of law, you are required to answer my questions fully and truthfully. This requirement is set forth in Metropolitan Police Department General Order Number 1202.1, Part 1, Section F6, and in section 2.1:5 of the Metropolitan Police Department Manual. If you refuse to answer my questions, this in itself is a violation of the rules of the Department, and you will be subject to disciplinary penalties.

\* \* \* \* \* \*

*I will now order you to relate to me your account of this matter.* [Emphasis added.]

Appellee was given by his superior officer at the outset a promise of transactional immunity—which was subsequently manifestly violated. Later, in the superior officer's statement a promise of "use immunity" was also made to appellee. Not only that, he was assured it was in a purely administrative, not a criminal, phase. No issue has been made on transactional immunity during this appeal from the order to suppress evidence, though the trial judge did comment that it caused due process concerns for him.[4] It is my view that the

---

**3.** *See, e.g., Green v. United States,* D.C.App., 377 A.2d 1132 (1977), and *Braxton v. United States,* D.C.App., 328 A.2d 385 (1974).

**4.** There was a colloquy about lack of legal authority on the part of the police lieutenant to grant transactional immunity. This nevertheless would leave open a due process question if

it brought about a damaging statement by a suspect; there would also be a supervisory power issue on whether the court should permit those in high authority to compel testimony on this false basis and then violate its pledge.

transactional immunity promise at the outset of the lieutenant's official representation should be considered as part of the mosaic in this case.

I will discuss first the "clearly erroneous" issue, however, and then the immunity problem, which apparently gives the majority no real concern.

A. After a lengthy evidentiary hearing and a full discussion with counsel, the trial court concluded that the government had not successfully carried its evidentiary burden in this case. Where there is, as here,[5] a claim of use immunity violation by the government, the government has the burden of establishing that its evidence is not tainted by showing it had an independent, legitimate source for the evidence in dispute. *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1664, 32 L.Ed.2d 212 (1972). The court there said:

> This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

The trial judge found from the evidence that this burden had not been met by the government. The majority opinion concludes this finding is clearly erroneous. D.C.Code 1981, § 17–305(a). The "clearly erroneous" doctrine means that to reverse on this score the court must have a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Under this rule, the court may not enter into a de novo review of the record, nor may it determine findings to be clearly erroneous (or

plainly wrong) simply because it may not agree with the trial court's findings. An appellate court accepts the presumption that the trial court's findings are correct and does not re-evaluate the evidence nor substitute its judgment for the court's firsthand evaluation, and the party attacking the findings has the burden to demonstrate they are clearly erroneous.[6] *Lindsay v. McDonnell Douglas Aircraft Corp.*, 485 F.2d 1288 (8th Cir. 1973). With this in mind, it is interesting to review the basis for the government's attack here on the trial court's findings.

Essentially, the government contends the ruling of the trial court was not supported by evidence because (a) its witness denied that Officer Anderson's compelled statement was used, (b) its witness testified that one factor leading to the additional investigation was Officer Anderson's (appellee's) refusal to take a lie detector test, and (c) even without appellee's compelled statement a second inquiry of Mr. Akers (the fugitive) would have taken place.

In *Kastigar v. United States, supra,* the court reaffirmed the proposition that where a defendant has given an immunized statement and is later prosecuted the government has the affirmative duty to show it had a source independent of the compelled testimony. The federal statute involved in *Kastigar, supra,* provided:

> [N]o testimony or other information compelled under the order (or any information directly *or indirectly derived* from such testimony or other information) may be used against the witness in any criminal case.... 18 U.S.C. § 6002. [Emphasis added.]

This total prohibition, said the court, bars not only the use of compelled testimony as an investigatory lead, but also bars the use

---

Protecting the integrity of the administration of criminal justice at every stage is always a proper matter for concern by the trial court, let alone the Court of Appeals.

**5.** The government does not dispute that there is present a "use" immunity in this case. It did dispute at the trial court hearing that the defendant was granted transactional immunity on

the ground that the superior officer did not have legal authority to grant transactional immunity, though he purported to give that immunity.

**6.** Here, the government failed to do this on appeal, so the court now undertakes to do so by dint of labored argument.

of any evidence obtained by focusing the investigation on a witness as a result of his compelled disclosures. *Id.* at 460, 92 S.Ct. at 1664. The court emphasized that immunity from the use of compelled testimony "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect...." *Id.* at 453, 92 S.Ct. at 1661. [Emphasis in original.]

With the affirmative duty of the government in mind, it is evident that a general assertion by the government that it did not make any use of the compelled statement is not enough.[7] It must affirmatively demonstrate this by evidence sufficient to satisfy the court that it met the stern test of *Kastigar.*

The government next asserts it was impelled to conduct another investigation by the refusal of appellee to take a lie detector test. But this assertion was laid to rest by the testimony of the government's only witness at the hearing:

[*Question*]: Well, let me ask you this, Sgt. Tadle: Isn't it a fact that it was determined that Officer Campbell would not have to take a lie detector test?

[*Answer*]: It is my understanding it was stated that Officer Campbell would take the polygraph examination only after Officer Anderson would take it.

[*Question*]: *And didn't your investigation likewise reveal, sir, that Officer Anderson had said he would take a lie detector test if Officer Campbell would be required to take one?*

[*Answer*]: From what I understand, *that did happen.*

[*Question*]: You say it did happen?

[*Answer*]: That is what I understood was suggested, but it never materialized. [Emphasis added.]

This would seem to dispose of that asserted basis for conducting a further investigation of appellee.

The remaining general assertion by the government is that it would have conducted another interview anyway with Mr. Akers. This falls short once again from the sort of evidence needed to carry the government's burden.

Transposed against the government's defective showing is the trial court's specific findings that the evidence established that the objective of the police investigator was to "corroborate" (or not) the immunized statement of appellee, i.e., to either confirm or deny the statements contained in the written statement. Further, found the court, the questioning in the ensuing interview with Mr. Akers showed that use was being made of the prior compelled testimony of appellee. Beyond this, the trial court found the government had failed to adduce testimony by police officials who were in a position to give specific testimony on the relevant considerations needed to determine whether any use was actually made of the immunized testimony.[8] Thus, concluded the court, the government failed to meet its burden and the motion to suppress was granted.

I fail to understand how this court—on that record—can conclude as a matter of law that the findings of the trial court are clearly erroneous.[9] In doing so, (a) the court casts aside the correct application of the "clearly erroneous" test, and (b) fails to deal with the evidence upon which the trial court based its findings.

B. But beyond all this, the off-handedness of the court's treatment of the problems presented to us by the immunity issue is more troubling. Ordinarily, immunity is utilized where the prosecution has little or no evidence against several suspects and concludes it should grant one of them immunity so as to compel testimony for use against the others. In the public interest,

---

**7.** *See, e.g., United States v. McDaniel,* 482 F.2d 305, 312 (8th Cir. 1973).

**8.** The government complained that the trial court would not grant a further hearing to do so when at the end of the evidentiary hearing the court noted the failure of government proof. *Courts commonly grant only one hearing on a motion to suppress, at the end of which motions to suppress are frequently granted for failure of proof by the government.*

**9.** Perhaps this is why the majority opinion is argumentative on this score.

the government permits one to go free in order to bring to justice the others. This is preferable to the probable alternative of allowing all to go free.[10]

In this case, however, the charge being investigated was assault by a police officer against a fugitive from a narcotics arrest. There was apparently an intention here from the outset to "use" the immunized statement as the cornerstone of a second investigation.[11] At the evidentiary hearing the government testified:

[*Question*]: Would you be kind enough to read that to His Honor?

[*Answer*]: Okay. "On October 17, 1978, this case was assigned to this official to be re-investigated. It was determined that the second *investigation would only address itself to corroborating Officer Anderson kicking the defendant, or was the contact between the two an accident as propounded by Officer Anderson and Mr. Akers.*"

[*Question*]: So, am I to gather from that, then, that inasmuch as Officer Anderson, at that point, had said also that the contact between the two was an accident, that you were, at that point, *making an effort to see if you could corroborate that matter?*

[*Answer*]: *I was trying to corroborate the truth.*

[*Question*]: But your efforts to corroborate, or to find evidence either way, were all done with the premise in mind, were they not, among other premises but *nonetheless with premise in mind that Officer Anderson had given a statement saying that it was an accident?*

[*Answer*]: Keeping in mind, as you stated there *were other premises, the answer to your question is yes.* [Emphasis added.]

Small wonder the trial court later found that the government impermissibly "used" the immunized statement. The second investigation revolved around the statements in the immunity document, according to the government. While it is elementary that immunity does not reach subsequent perjury or false statements, there is no charge in the indictment here for either crime. As so often happens when a prosecution starts with a questionable approach, the government came into the trial court asserting at the outset its intention to place into evidence the immunized statements (September 27 and 28) in its prosecution of the assault charge—the only charge being investigated when the statement was compelled. This would be a head-on collision with the constitutional protection in the matter of compelled testimony. In its off-handed treatment of the immunity issue the majority leaves available to the government at a subsequent trial on the assault charge the immunized statements.

This defendant was indicted on the same charge being investigated when he was granted immunity and compelled to give testimony concerning it. The prosecution of this charge in the indictment (assault) should not be permitted in the face of the trial court's rational findings on impermissible use of the immunized statement. An immunity grant, of course, does not extend in futuro. If under grant of immunity an individual commits perjury or makes a false statement (or false reporting) she or he is subject to prosecution for those offenses or any other new offense committed. The immunity blanket covers only the transactions in existence when the immunity is granted. This assumes that if the government asserts false statements were made in the immunized statement it will bring a perjury or false statement prosecution, instead of attempting to breach the immunity in relation to the charge then under investigation. There legally is no perjury until there is a judgment of conviction of perjury. Until then it is only a charge that perjury was

---

10. *See, e.g.,* Wharton's Criminal Procedure 409 (12th ed. 1975).

11. It is, generally speaking, not for a court to second guess the grant of immunity. On the other hand, if the immunized witness is then indicted for the same offense, the court should scrutinize with care any claim directed at that grant of immunity. This should almost go without saying.

committed and this is yet to be proved in court.

Turning to the promise of transactional immunity [12] made by appellee's superior officer in this case, it is true the officer had no statutory authority to grant transactional immunity. But that would not settle the matter from the standpoint of due process, or in the eyes of a court exercising its supervisory authority over the administration of criminal justice. I should have thought that where a high police official in an official act (as here) made such a promise to an underlying officer who, in reliance, then relinquished his constitutional right and proceeded to furnish a statement,[13] the court would be disposed to insure that the covenant is honored. It is a matter of governmental honor. This court heretofore has been scrupulous in the enforcement of similar governmental promises, e.g., in plea bargaining cases. In speaking to the enforcement of agreements made by the government with a defendant, this court said "[i]n order to maintain the integrity of their office, prosecutors must be held to 'meticulous standards of both promise and performance....'" *Green v. United States, supra* at 1134 (citation omitted). While it was here a high police official and not the prosecutor or court who made the promise of transactional immunity the fact remains that the promise was made by the police official who was then in charge of the investigation and that his underling was entitled to repose confidence in the official pledge. It was the promise of the high police official in charge of the administrative investigation which procured the abandonment of his previously asserted constitutional right and the ensuing statement which avowedly became the cornerstone of the subsequent investigation. As a matter of fundamental fairness, the pledge of the high police official must be viewed a commitment of the government under these circumstances. *See Giglio v. United States,*

405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Consequently, subsequent violation of that promise strikes me as a violation of due process of law, and certainly it should invoke a court's supervisory power over the fair and decent administration of justice.

## II.

Going outside the issue in this case, the concurring opinion volunteers some advice to the government for later use at trial, in securing the conviction of the defendant in this case on the obstruction of justice charge. Intrusively, the concurring opinion states that given the well-settled proposition that an immunity blanket does not extend to later false statements, the immunized statements in this case would be admissible at trial in the prosecution of the obstruction of justice charge. The author apparently bases this abstract advisory opinion on the ground that the indictment on this charge alleges willful misrepresentations were made to "obstruct, delay, or prevent the communication to an investigator of the District of Columbia by any person of information relating to a violation of any criminal statutes." In support, *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) is invoked. *Apfelbaum* decided that the Fifth Amendment protection does not prevent the government from using immunized statements at a subsequent trial on a false statement charge. The concurring opinion here extends that unremarkable holding to a new proposition: The immunized statements here would be admissible on the obstruction charge because the statute and indictment use the term "misrepresentation."

The gist of the charge here in this indictment, as I understand it from the record made thus far, is that the defendant violated the obstruction statute by contacting and intimidating the victim of the alleged assault.

---

**12.** Transactional immunity means that one may not later be prosecuted for an offense to which the compelled testimony relates. *See, e.g., Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

**13.** Here, there is the added consideration that the policeman had previously declined to furnish the statement.

In *In re K.W.G.*, D.C.App., 374 A.2d 852 (1977), the defendant was indicted for willfully endeavoring "*by means of misrepresentation*" to obstruct, delay, and prevent communication to Police Department officers of a violation of the robbery statute. The evidence underlying the obstruction charge was that when officers went to an apartment in pursuit of robbers the defendant answered the door and said no one else was inside; the officers saw a closed door to one of the rooms and the defendant said no one was in the room; and upon forcing entry, the officers located the robbers inside. The individual who gave the officers the false information was indicted and convicted for obstruction of justice. On appeal, this court reversed. The court said that "[p]roof of violation of the statute requires a showing that one 'willfully endeavors . . . to prevent the communication to an investigator . . . by any . . . person of information relating to a violation.'" *Id.* at 853. The court held no such showing was made as the fugitives were trying to avoid, not initiate, a contact with the police concerning the robbery under investigation.

It would be for the trial court, not this court, to determine in the first instance whether immunized statements in this case would first have to survive the constitutional issue, and if otherwise admissible, whether their relevance on obstruction of justice was established. The problem on the latter would be whether a compelled pre-indictment statement by the defendant to the police in which he avoids confessing outright to the crime being investigated is relevant to an obstruction of justice charge based upon efforts by the defendant to impede statements to the police by a material witness.

CONCLUSION

This defendant was told (a) there would be no criminal charges preferred against

him, and (b) the criminal phase had ended and the investigation then commencing was solely of an administrative nature. On this basis, he was ordered by his superior officer to answer questions. Relying on the pledge, he waived his constitutional right and answered them and the government then broke the compact and turned right around and indicted him for assault—the very charge he was immunized on. This is a serious breach of governmental integrity. We have been scrupulous in the past in our insistence that the government keep pledges made to obtain sacrifice of an individual's constitutional rights—but not here. I have always been of the view that we do not need convictions on this basis. I hope the full court will not abandon its standard of treating all criminal defendants equally. We are required to display equanimity.

I would suppress the evidence on the assault charge.[14]

---

**14.** The situation on the obstruction of justice charge, the evidence of which both pre-dates and post-dates the compelled statement is another matter and one which would require specific exploration by the trial judge.

If this decision stands and the case is set for trial as the charges now stand, it will be for the trial court to decide whether the defendant retains the opportunity to raise due process issues and those related to supervisory power over the administration of criminal justice.