UNITED STATES, Appellant,

v.

Morris J. WARREN, Appellee.

No. 9911.

District of Columbia Court of Appeals.

Argued Feb. 11, 1976.

Decided May 5, 1977.

John W. Polk, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry and Raymond Banoun, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

Mark W. Foster, Washington, D.C., appointed by this court, for appellee.

Before KELLY, FICKLING [*] and YEAGLEY, Associate Judges.

YEAGLEY, Associate Judge:

In this government appeal [1] we are asked to determine whether the trial court erred in granting appellee's motion to dismiss an indictment on the ground that it was based in part on information he had provided the government under a promise of use and derivative use immunity. We cannot disagree with the trial court's construction of the immunity agreements in question. Because we also conclude its findings are supported by the evidence, we affirm.

The record indicates that in earlier proceedings appellee Warren was tried and

---

[*] Associate Judge FICKLING participated at argument and in post-argument discussions but died March 6, 1977.

1. D.C.Code 1973, § 23–104(c).

convicted in late 1973 of a series of armed rapes which had become known as the "green Vega rape cases." In the spring of 1974, the government was continuing a two-year-old investigation of a series of unsolved and widely publicized cases collectively known as the "freeway phantom homicides." Suspecting that a connection existed between the two sets of crimes, the government approached Warren in April 1974 in an attempt to develop him as a source of information and witness with respect to the freeway killings. A series of meetings between the parties beginning on May 1, 1974, resulted in three separate written agreements in which Warren agreed to provide certain information in return for immunity from prosecution.

On May 1, 1974, the government proposed an arrangement to appellee under which information would not be used against him so long as it was truthful, complete, accurate, and verifiable through corroboration. Under the proposal, appellee would also testify before a grand jury and in open court, and enter a guilty plea to some lesser offense in the freeway homicides consistent with his own admissions. At that time, Warren indicated his understanding of the arrangement and a willingness to cooperate, but he insisted that the agreement not be reduced to writing, because he did not want to be held strictly accountable for the accuracy of his information until he had time to remember all of the facts and get them straight in his mind. Further meetings were held between the parties on May 9 and 10, and on May 13 appellee finally requested a written agreement. He insisted, and the government agreed, that the proviso that all information be true and accurate be stricken. Two subsequent agreements were reduced to writing on May 16 and June 4 containing essentially the same terms, but they included the condition that appellee's information be true, complete and accurate.

During the period May 1, 1974, to June 4, 1974, appellee cooperated with the government by providing it with limited information with respect to the freeway homicides. The trial court found that on various occasions, he deliberately gave misleading or inaccurate information regarding those offenses. He also made certain statements, however, which were found to be accurate with respect to other unsolved rape cases which apparently he had confused with freeway homicides. In particular, he told the government about his ownership of a white convertible which the trial court said was believed to have been the vehicle involved in the rape offenses charged in the present indictment. While he was recounting what he believed to be the events leading up to a freeway homicide, Warren also made a statement about a man appearing near one crime scene with large barking dogs which the government later recognized as corresponding to a statement made by one of the rape victims in the instant case. Shortly after the final agreement on June 4, 1974, appellee repudiated the arrangement and refused to cooperate further. He was subsequently charged with the armed kidnapping and rapes which are the subject of the instant appeal.

If, after making "a deal" with a potential defendant for information, the government later seeks to avoid the arrangement and to prosecute him, "its decision so to do will come under scrutiny." *United States v. Paiva,* 294 F.Supp. 742, 747 (D.D.C.1969). A principal reason for such review is to protect not only the integrity of the plea bargaining system, but also, as in this case, the ability of the prosecutor to obtain vital evidence from an accused implicating others. It would introduce unfairness into the entire process if the government, after striking a bargain, were permitted to avoid its promises to the accused by some strained construction of the agreement in question. *See Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

With this background we proceed to examine the proceedings had on appellee's motion to dismiss the indictment.

The conclusions of the trial court with respect to the various agreements may be summarized as follows:

(1) The series of three documents culminating in the writing of June 4, 1974 "must be viewed in their totality" as representing the understanding reached on May 1, 1974.

(2) The negotiations prior to the final agreement were directed toward obtaining information from appellee regarding the freeway homicides. It was only with respect to those offenses that the promise of immunity was conditioned upon appellee's testifying and pleading guilty to a lesser charge.

(3) Appellee failed to perform his part of the agreement as to the freeway homicides and there is no basis for requiring unilateral performance by the government with respect to those offenses.

(4) The government informally promised not to use information supplied by appellee "incidental" to that given in connection with the freeway homicides, so long as that information was also true and accurate.

(5) Notwithstanding appellee's failure to meet the conditions of the government's promise regarding freeway homicides, justice requires that the informal promise with respect to the incidental offenses be interpreted as a grant of use and derivative use immunity.

(6) The government did not meet its burden of proving that in bringing the instant prosecution it did not use appellee's information regarding incidental offenses in some significant way. Such use could conceivably include assistance in focusing the investigation on appellee, or a decision to expand the scope and direction of the investigation, or to initiate prosecution.

■ The trial court based its decision to dismiss the indictment on extensive findings of fact, which we may not set aside since they are not plainly wrong or without evidence to support them. D.C.Code 1973, § 17–305(a); *Matthews v. United States,* D.C.App., 335 A.2d 251 (1975).[2]

Appellant's principal contention is that the trial court erroneously concluded "that the Government had promised appellee unconditional immunity from the use and derivative use of all statements relating to crimes other than the freeway phantom murders" (appellant's brief at 12). We do not agree that the court construed the agreements as providing for unconditional immunity. Although it distinguished the information provided by appellee with respect to the freeway homicides from that related to so-called "incidental" offenses, the court concluded that immunity from prosecution for *either* category of offenses carried the condition that the information be complete, truthful and accurate. It was only with respect to the freeway homicides that the court found that appellee failed to perform his part of the bargain by providing incorrect information and by failing to testify and enter a plea to a reduced charge. The court concluded that after the defendant refused to cooperate further, the government was free to prosecute him for offenses arising from the freeway homicides. However, in the interest of justice the government could not use information he had provided relating to the "incidental" offenses which, though incomplete, was not otherwise untruthful or inaccurate.

■ As indicated at the outset, we cannot disagree with the trial court's construction of the three agreements in question. It was not unreasonable to conclude that the government informally promised appellee not to use information with respect to the "incidental" offenses,[3] or that Warren's obligation to testify and plead guilty to a

---

2. The resolution of these issues is of somewhat academic interest since appellee will soon begin serving the following sentences in Maryland: life imprisonment for murder; 15 years consecutive for assault with intent to maim; 10 years consecutive for carrying a handgun; and 20 years concurrent for attempted robbery. *See Warren v. State,* 29 Md.App. 560, 350 A.2d 173 (Md.Ct.Spec.App.1976).

3. This conclusion is consistent with various courts' analyses of the scope of statutory grants of immunity. *See, e. g., Brown v. United States,* 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959), aff'g, 247 F.2d 332 (2d Cir. 1957); *Kronick v. United States,* 343 F.2d 436 (9th Cir. 1965); *United States v. Tramunti,* 343 F.2d 548 (2d Cir. 1965), *vacated on other grounds,* 384 U.S. 886, 86 S.Ct. 1906, 16 L.Ed.2d 993 (1966).

reduced charge applied only to freeway homicides. The critical question is whether he was entitled to immunity with respect to the "incidental" offenses. Clearly, the information he gave regarding the freeway homicides was inaccurate and at times purposefully misleading. There is no indication in the record, however, that the statements he made with respect to the rapes charged in the indictment were untruthful or inaccurate. Even though he repudiated the bargain without giving "complete" details about the rapes, we are not persuaded that the government was thereby entitled to use the information it obtained before the agreement was frustrated. We therefore conclude that appellee was entitled to immunity for the two "incidental" offenses with which he was charged.

■ We also reject appellant's contention that the trial court improperly applied the holding in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), that once the defendant establishes there had been a grant of immunity, the prosecution has the burden to establish that the evidence it proposes to use against Warren was derived from an independent legitimate source. The government argues that the standard enumerated in *Kastigar* was not applicable because appellee was never "compelled to testify over invocation of his Fifth Amendment privilege against self incrimination" (appellant's brief at 15). Although technically Warren was not "compelled to testify," it is a constitutional principle of long standing that evidence of guilt induced from a person under a governmental promise of immunity must be excluded under the Self-Incrimination Clause of the Fifth Amendment. *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963). The Supreme Court has never limited the application of that clause to compelled testimony in criminal court proceedings. In addition, promises of immunity are analogous to plea bargaining agreements which have consistently been recognized as judicially enforceable under sound considerations of public policy. *See, e. g., Santobello v. New York,*

*supra; Braxton v. United States,* D.C.App., 328 A.2d 385 (1974).

In *United States v. McDaniel,* 482 F.2d 305 (8th Cir. 1973), a defendant claimed immunity under a provision in a state law concerning individuals testifying before a grand jury. In applying the *Kastigar* standard, the Eighth Circuit said:

We find, however, that even though the voluminous reports, which we have examined, may have afforded proof of an independent source of the evidence adduced at McDaniel's trial, such reports nevertheless fail to satisfy the government's burden of proving that the United States attorney, who admittedly read McDaniel's grand jury testimony prior to the indictments, did not use it in some significant way short of introducing tainted evidence. [*Id.* at 311.]

■ Here, the statement appellee made concerning the ownership of the white convertible and his comment regarding the old man and dogs, even though they were not necessarily to be used by the government as evidence at trial, were instrumental in the government's decision to focus its investigation of the rapes in question on appellee, and to subsequently initiate prosecution against him. We therefore conclude that the record supports the trial court's conclusion that the government did not meet its burden under *Kastigar* and *McDaniel* of proving that the evidence it proposed to use against appellee was not in any way derived from the information he provided with respect to the charged offenses.

Accordingly, the judgment of the trial court is hereby

*Affirmed.*