Kenneth AIKEN, Appellant,

v.

UNITED STATES, Appellee.

Nos. 01–CF–1503, 04–CF–963, 05–CO–505, 05–CO–506.

District of Columbia Court of Appeals.

Argued Sept. 18, 2007.

Decided Sept. 11, 2008.

Jonathan W. Anderson, Public Defender
Service, with whom James Klein, Jaclyn S.

Frankfurt, and Eve Hanan, Public Defender Service, were on the brief, for appellant.

Suzanne G. Curt, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Elizabeth Trosman, and James S. Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and GLICKMAN and KRAMER, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Kenneth Aiken was convicted of a series of felony and misdemeanor offenses against his former girlfriend, Patricia Parker, and of escaping from a halfway house to which he had been committed prior to trial. His arguments on appeal center on the alleged deprivation of his Sixth Amendment right to the effective assistance of counsel. Appellant maintains the trial court abused its discretion by denying his pretrial request for a new attorney and by rejecting two post-conviction claims of ineffectiveness without a hearing.

We remand for a hearing on one of appellant's contentions. Prior to his indictment, appellant testified at a hearing on the complainant's petition for a civil protection order (CPO). His testimony in that civil proceeding was covered by a statutory grant of immunity from use and derivative use at his criminal trial.[1] However, appellant's criminal defense counsel took no steps to prevent such impermissible use, even though both the complainant and a police detective were privy to appellant's immunized testimony. Had defense counsel requested a so-called *Kastigar* hearing, appellant contends, the government would have borne the burden of proving that its evidence was not tainted by any exposure to his CPO hearing testimony. Whether counsel was ineffective in failing to request such a hearing, as appellant asserts, cannot be determined on the existing record. We therefore conclude that an evidentiary hearing on this claim is required. In all other respects, we affirm the trial court's rulings.

## I.

On March 11, 2000, according to the government's evidence, appellant assaulted Parker during a domestic dispute and was arrested. Two days later, on March 13, he allegedly threatened Parker with bodily harm if he went to jail. Parker did not report the March 13 threat to the authorities for several months, however, and in the meantime, the assault charge against appellant was dismissed without prejudice when she did not appear for his trial. A few months afterward, in mid-August, appellant started stalking Parker, damaging and destroying her property, and threatening her and her children. Appellant was arrested on a felony threats charge, appointed counsel, ordered to stay away from Parker, and released to a halfway house. He also was served with a notice to appear on September 26 for a hearing in Superior Court on Parker's request for a CPO.

At the September 26 hearing, Parker was represented by the District of Columbia Corporation Counsel[2] and accompanied by Detective Pamela Montague, the lead investigator on the pending threats case against appellant.[3] Appellant ap-

---

1. *See* D.C. CODE § 16–1002(c) (2001).

2. *See* D.C. CODE §§ 16–1003(a), –1005(a) (2001). The Corporation Counsel has since been renamed the Attorney General.

3. Detective Montague testified at appellant's criminal trial that she attended the CPO hearing "[j]ust to support the complainant."

peared alone and represented himself *pro se* at the CPO hearing.[4] Under oath, Parker described appellant's harassment beginning with his assault on her in March. Parker claimed she ended her intimate relationship with appellant after that assault and had refused his subsequent overtures to get back together. Appellant took the stand to rebut Parker. He testified that Parker, not he, was the aggressor on March 11; that their romantic relationship had resumed in April and did not end until he walked out on her in July; and that she had fabricated her accusations against him because he refused to marry her. Appellant attributed the vandalism of Parker's property and the threats she had received in August and September to enemies of his cousin, David Brox, who had moved in with Parker after appellant's departure. It appears that both Parker and Detective Montague were present during appellant's testimony.

In granting the CPO at the conclusion of the hearing, the court made clear that it credited Parker and disbelieved appellant. That night, appellant did not return to the halfway house. In violation of the CPO, he telephoned Parker the next day. The following week, on October 2, Parker reported to the police that appellant had confronted her outside her apartment building, thrown a brick at her, and then hit her face with his fists, fracturing her cheekbone. Appellant soon was re-arrested.

Parker testified before the grand jury not long after the CPO hearing.[5] Appellant eventually was charged in a fifteen-count indictment with having committed felony and misdemeanor offenses against Parker in approximately ten incidents of domestic violence between March and October, including aggravated assault, assault with a dangerous weapon, and simple assault; felony threats; stalking, destruction of property, and violations of the CPO. In a separate indictment, appellant also was charged with escape as a result of his abscondence from the halfway house. The two cases were joined for trial.

On the morning of trial, appellant informed the judge that he did not "want to go to trial with this attorney" because she had not investigated his case properly. Following an extended colloquy with appellant and his counsel, the judge ruled that counsel had prepared adequately for trial and would not be replaced. The case then proceeded to trial. Parker's testimony against appellant was corroborated by other prosecution witnesses, including the aforementioned David Brox, and by forensic and other physical evidence. Appellant denied the charges (except for the escape and CPO violations, which he admitted). His exculpatory testimony, which was not corroborated, mirrored his explanation at the CPO hearing.

The jury acquitted appellant of assault with a dangerous weapon and aggravated assault but found him guilty of the lesser-included offense of simple assault and of all the other felony charges. The trial judge found appellant guilty of the remaining misdemeanor counts.

In August 2004, appellant moved for a new trial pursuant to D.C.Code § 23–110 (2001) on grounds of ineffective assistance by his counsel. Among his numerous claims, he asserted defense counsel was ineffective in failing to request a hearing to ensure that the prosecution made no use of

---

4. Appellant's criminal defense counsel did not attend the hearing and, in response to his request, the court ruled that it could not appoint counsel to assist him there.

5. It is unclear from the record when, if ever, Detective Montague appeared before the grand jury.

his CPO hearing testimony; and in failing to obtain the transcript of Parker's CPO hearing testimony for use in his defense. Appellant alleged that he told counsel about his and Parker's testimony and "specifically asked" her to order a transcript, which counsel "indicated" she would do.

In its opposition to appellant's motion, the government urged the court to deny the foregoing claims summarily. Even if defense counsel's performance was deficient, the government argued, appellant could not demonstrate prejudice because the evidence of his guilt was overwhelming; [6] Parker's testimony at trial was "consistent in all significant details" with what she said at the CPO hearing; and "nothing in the record" indicated the prosecutor had used the "fruits" of appellant's CPO hearing testimony against him. In a supporting affidavit, the prosecutor stated that she was "aware" of the CPO hearing in preparing appellant's case for indictment and trial, and "well aware" that D.C.Code § 16–1002(c) "strictly prohibits the use of a respondent's testimony and fruits of that testimony . . . in a criminal proceeding involving the same matter(s)." The prosecutor averred that she never spoke with the complainant or anyone else "about what happened" at the CPO hearing, and never "request[ed], possess[ed], or read a transcript of that hearing." Appellant's defense counsel also provided an affidavit in support of the government's opposition,

but she professed "not [to] have a specific recollection of what was involved regarding Mr. Aiken's civil protective order hearing," though she believed appellant had told her he was going to consent to the CPO "without making admissions." [7]

On April 14, 2005, the trial judge denied appellant's claims of ineffective assistance relating to the CPO proceeding without holding an evidentiary hearing on them, "for the reasons stated in the government's opposition." [8]

## II. Appellant's Pretrial Request for New Counsel

■ Whether the trial court erred in denying appellant's pretrial request for new counsel turns on the adequacy of the court's inquiry to dispose of appellant's complaints. We have held that when a defendant asserts a pretrial claim of ineffective assistance of counsel, "the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." [9] More than *pro forma* inquiry is required; the court's questioning must be "specific and thorough" enough "to elucidate counsel's degree of compliance" with the applicable "criteria of professional competence." [10] Subject to that standard, the "substance and scope" of the inquiry are committed to "the sound discretion of the trial court." [11] Thus, we will "defer to the trial judge's determination as to the form,

---

6. The government also suggested that appellant's claims of ineffectiveness were "irrelevant" to appellant's convictions of crimes committed after the CPO hearing.

7. Appellant denied having told his counsel that he would consent to the CPO. As no hearing was held on the § 23–110 motion, this factual dispute remains unresolved.

8. The judge also rejected appellant's other claims of ineffective assistance, after holding a hearing on some of them, and accordingly

denied his motion for a new trial. It is unnecessary to describe appellant's other claims, as he has not pursued them in this appeal.

9. *Monroe v. United States*, 389 A.2d 811, 820 (D.C.1978).

10. *Farrell v. United States*, 391 A.2d 755, 760–61 (D.C.1978).

11. *Id.* at 760.

substance and scope of the inquiry unless the record compels us to act otherwise." [12] The trial court's decision as to whether to grant new counsel "will be disturbed on appeal only if the court has abused its discretion." [13]

We find no abuse of discretion here. At the outset, when appellant vaguely declared that his counsel did not have his "best interest" at heart, the judge urged him to articulate his "specific complaint." Appellant said he was dissatisfied because his case was "not being investigated." The judge then questioned appellant and defense counsel extensively about the circumstances and particulars of that complaint. Among other things, the judge confirmed (and appellant himself conceded) that counsel had hired an investigator, visited the crime scene, obtained extensive discovery from the government, reviewed applicable law, conferred at length with appellant about his potential defenses, subpoenaed documents suggested by appellant, and interviewed nearly all the witnesses that appellant had identified.

Upon further probing, the judge ascertained that counsel had not fulfilled appellant's request that she interview his mother and the day care center employees who cared for Parker's young children. According to appellant, his mother could have attested to his continuing relationship with Parker after March, and the day care workers could have confirmed that he picked up Parker's children during the summer of 2000 (inferentially bolstering his claim that he and Parker were still together then). However, additional questioning satisfied the judge that counsel had not been neglectful in failing to interview these witnesses.

Counsel explained that she viewed the proffered testimony of appellant's mother and the day care personnel as harmful or, at best, unnecessary to the defense and essentially irrelevant. Appellant's mother had obtained a protective order against him and left town. When counsel went looking for her, appellant's brother told her "none of us want anything to do with him, and don't you dare call my mother [ ] and upset her." As to the day care personnel, counsel was wary because she believed their suggested testimony would only substantiate one of Parker's allegations of stalking—that appellant "kept showing up at the day care center." Appellant expressed no disagreement with this reasoning. Moreover, counsel stated, Parker "doesn't deny" that she and appellant were "still together" after March; "[s]he says that they did continue to talk on the phone and be friends, that it was in August that things took a downward turn." The judge confirmed with counsel her understanding that Parker "already acknowledges what Mr. Aiken is trying to show."

On hearing counsel's statement that Parker admitted their relationship continued into the summer, appellant expressed surprise. "[W]hen she first testified," he stated, "she said after March we had no dealings." Appellant faults the judge for not picking up on this discrepancy and inquiring about it. Had the judge done so, appellant argues, she would have unearthed the fact that his counsel was ignorant of Parker's CPO hearing testimony and partially mistaken about what she would say on the witness stand. We are not persuaded. Without more, appellant's comment was not enough to alert the judge that counsel's investigation of the complainant was inadequate. Appellant

12. *Wingate v. United States,* 669 A.2d 1275, 1280 (D.C.1995) (internal quotation marks and citation omitted).

13. *Monroe, supra* note 9, 389 A.2d at 822.

did not complain that counsel was unfamiliar with Parker's earlier testimony. So far as appeared, to both appellant and the judge, counsel had fulfilled her duty to investigate what Parker would say at trial. Under the circumstances, the judge's failure to question counsel's apparent knowledge of Parker's version of events was far from an abuse of discretion.[14]

As it turned out, contrary to counsel's expectation, Parker insisted at trial that she ended her relationship with appellant in March and did not resume it thereafter. "But we must evaluate the court's *Monroe–Farrell* inquiry on the basis of the situation presented to the court pretrial, rather than by hindsight examination" in light of later developments at trial or afterward.[15] Even if the testimony at trial revealed inadequate preparation by counsel, appellant may not rely on that revelation to challenge the trial judge's otherwise justified pretrial ruling. Subsequently disclosed deficiencies must be raised in a motion for a new trial pursuant to D.C.Code § 23–110.

When defense counsel described Parker's anticipated testimony, appellant's expression of surprise was a sign that counsel might not have communicated with him adequately regarding his defense. A possible issue of inadequate attorney-client communication also was indicated when counsel explained that she had not sent her investigator to interview witnesses (such as the day care personnel) whose testimony she believed would be harmful or irrelevant, and appellant interjected, "Why not tell me this? I had this [*sic*] over two months ago." Recognizing the issue, the judge asked counsel how many times she had met with appellant, how many hours they had conferred, and whether they had discussed "matters of defense and what potential defenses are." Counsel stated that she had met with appellant at the D.C. Jail "five or six" times "for a minimum of one hour and usually an hour and a half to two [hours each time]." She confirmed that they had pored over his defense together, commenting that "he's been very good about giving me suggestions and notes and with his ideas for defense. We've gone through those page by page." Counsel attributed appellant's sudden dissatisfaction with her to a meeting the previous evening, in which her law partner cross-examined appellant to prepare him for taking the stand at trial. According to counsel, appellant "stormed out" when her partner advised him "to work something out" because "everything you say in your testimony convicts you." Up until then, counsel stated, "we had spent several hours together and it was fine."

Appellant argues that the judge should have replaced his counsel after she admitted "feel[ing] very uncomfortable with [appellant's] outburst. If he doesn't want me that much, because I have to, he wants to testify, I have to be able to talk to him and feel comfortable." But counsel's acknowledgment of her discomfort did not mean she was unprepared or unable to represent appellant effectively, so long as he cooperated with her. Later that day, in fact, counsel announced that appellant had apologized to her and wanted to apologize to the judge as well. Counsel believed "that [she and appellant were] back on track as

---

14. *See Lane v. United States,* 737 A.2d 541, 547 (D.C.1999) ("Once it has addressed the defendant's specific complaints, the court has 'no basis ... to inquire further into the attorney-client relationship or about defense counsel's preparation for trial.' ") (quoting *Gordon*

*v. United States,* 582 A.2d 944, 946 (D.C. 1990)).

15. *Wingate, supra* note 12, 669 A.2d at 1285 (citations omitted).

far as an attorney-client relationship." The judge asked appellant if this was true, and he responded affirmatively. Even if this was not a waiver by appellant of any of his complaints, we cannot fault the judge for declining to remove his counsel merely because the attorney was disconcerted by her client's "outburst."

Ultimately, the judge declared herself "satisfied that [counsel] is doing an adequate job in her pretrial investigation and her pretrial matters." We think the judge's inquiry was sufficient to support that conclusion. With commendable persistence, the judge "carefully explore[d] the specifics of appellant's complaints," "followed up on each of appellant's assertions," and "gave appellant several opportunities to state all of his complaints."[16] From the judge's perspective at the time, counsel rebutted appellant's charges, displayed a firm grasp of the case, and confirmed that she had prepared diligently for trial. We conclude the judge did not abuse her discretion in denying appellant's pretrial request for new counsel.

### III.  Appellant's Post–Conviction Claims of Ineffective Assistance

■ Appellant also challenges the trial court's summary denial of two of his post-conviction claims of ineffective assistance of counsel. The decision whether to hold an evidentiary hearing on a motion for a new trial pursuant to D.C.Code § 23–110 is committed to the trial court's discretion, but the scope of that discretion is "quite narrow."[17] The statute requires a hearing "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."[18] Thus, "[a]ny question regarding the appropriateness of a hearing should be resolved in favor of holding a hearing."[19] This court "will affirm the trial court's denial of a § 23–110 motion without a hearing only if the claims (1) are palpably incredible; (2) are vague and conclusory; or (3) even if true, do not entitle the movant to relief."[20] "[W]e must be satisfied that under no circumstances could the petitioner establish facts warranting relief."[21]

■ Claims of ineffective assistance of counsel frequently require a hearing, "especially where the allegations of ineffectiveness relate to facts outside the trial record."[22] "The movant's only burden, prior to hearing, is adequately to allege facts which, if demonstrated, would establish ineffective assistance of counsel."[23] This means pleading "with requisite particularity, in light of the full record before the court, that his trial counsel's performance was deficient under prevailing professional norms, and that the deficient performance prejudiced his defense."[24]

16. *Wingate, supra* note 12, 669 A.2d at 1284.

17. *Long v. United States,* 910 A.2d 298, 308 (D.C.2006).

18. D.C.Code § 23–110(c) (2001).

19. *Newman v. United States,* 705 A.2d 246, 261 (D.C.1997) (internal brackets, quotation marks and citation omitted).

20. *Id.* (internal quotation marks and citation omitted).

21. *Long, supra* note 17, 910 A.2d at 308 (internal quotation marks and citations omitted).

22. *Newman, supra* note 19, 705 A.2d at 261 (internal quotation marks and citations omitted).

23. *Gray v. United States,* 617 A.2d 521, 523 (D.C.1992) (internal quotation marks and citation omitted).

24. *Long, supra* note 17, 910 A.2d at 309 (citing *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

Appellant presents two distinct, though factually related, claims of ineffective assistance. First, he argues, his trial counsel was ineffective because she failed to ensure that the prosecutor did not use evidence derived from his immunized testimony at the CPO hearing, even though two prosecution witnesses—Parker and Detective Montague—were exposed to that testimony. Second, appellant claims his trial counsel also was ineffective because she failed to obtain a transcript of the complainant's testimony at the CPO hearing. For the reasons that follow, we conclude that appellant is entitled to a hearing on the first of these claims of ineffectiveness, but not on the second.

## A. Defense Counsel's Failure to Safeguard Appellant's Right to Immunity

Appellant's claim that his defense counsel was constitutionally ineffective in failing to protect his right to immunity for his CPO hearing testimony presents us with a complicated issue. We must begin our analysis by examining the nature and extent of the statutory immunity in question, and how a criminal defendant may enforce it by requiring the prosecution to show that its evidence is not derived from the immunized testimony. Because we conclude that appellant was entitled to the protections he invokes, we then consider whether his allegations of ineffectiveness were sufficient to warrant a post-trial evidentiary hearing.

## 1. Appellant's Entitlement to Immunity and a *Kastigar* Hearing

When a complainant seeks a civil protection order based on allegations of intrafamily offenses that are, or may also be, the subject of a criminal prosecution, the respondent is confronted with a potentially difficult choice—whether to testify in opposition to the petition for the CPO. The respondent has a Fifth Amendment privilege against compelled self-incrimination. But remaining silent in the civil case may mean foregoing a defense to the petition and effectively conceding issuance of the CPO. This may result in drastic curtailment of the respondent's liberty.[25] The respondent thus may be under considerable pressure to testify in the civil proceeding. Yet if he testifies, and in effect waives his Fifth Amendment privilege in that proceeding, he runs the risk of furnishing the prosecutor with evidence out of his own mouth that could be used to convict him.

The Council of the District of Columbia undertook to alleviate this dilemma when it enacted D.C. Law 4–144, the "Proceedings Regarding Intrafamily Offenses Amendment Act of 1982." Section 3 of the 1982 Law amended the Intrafamily Offenses Act "to remove the [then] current prohibition upon criminal prosecutions being brought against a family member if a civil protection order case against the same person is already being litigated in the Family Division of the Superior Court."[26] In place of that prohibition, the

---

25. A CPO may, for example, require the respondent to participate in psychiatric and medical treatment and counseling; direct the respondent to avoid other family members, including his children; exclude the respondent from his home; and direct him to relinquish possession or use of his personal property. D.C. Code § 16–1005(c) (2001 & Supp. 2008). Violation of the CPO is punishable as criminal contempt and as a misdemeanor by a fine not exceeding $1,000 and imprisonment for up to 180 days. *Id.* § 16–1005(f), (g).

26. Council of the District of Columbia, Report of the Committee on the Judiciary on Bill 4–195, *The Proceedings Regarding Intrafamily Offenses Amendment Act of 1982* (May 12, 1982), p. 9.

Council amended D.C.Code § 16–1002 by adding subsection (c). The first sentence of subsection (c) states that "[t]he institution of criminal charges by the United States attorney shall be in addition to, and shall not affect the rights of the complainant to seek any other relief under this subchapter." At the same time, to ensure fairness to the defendant in the concurrent criminal and civil proceedings that henceforth would be authorized, the Council also added an immunity provision. This provision, the second sentence of D.C.Code § 16–1002(c), states that "[t]estimony of the respondent in any civil proceeding under this subchapter [including a CPO hearing] and the fruits of that testimony shall be inadmissible as evidence in a criminal trial except in a prosecution for perjury or false statements." By employing the term "fruits," Section 16–1002(c) prohibits derivative as well as direct evidentiary use by the prosecution of the defendant's CPO hearing testimony.

In its report on the 1982 amendments, the Judiciary Committee explained the immunity provision as follows:

> Section 3 carefully creates due process protections for the potential situation where the same person is a respondent in a civil protection case and a defendant in a criminal case involving the same intrafamily conduct. Section 3 advances a rule of evidence in new D.C.Code, sec. 16–1002 rendering a respondent's testimony, as well as the fruits of that testimony, inadmissible in a criminal proceeding. Moreover, section 3 provides

that so long as the respondent is compelled to testify at a civil hearing, any statement made there cannot be used in a criminal trial (except for perjury or false statement), even for impeachment purposes. *E.g., New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979).[27]

The reference to *Portash* is instructive. In that case, an analogous New Jersey statute provided that grand jury testimony by a public employee "and the evidence derived therefrom" could not be used against the employee in any subsequent criminal proceeding (other than a prosecution for perjury).[28] The Supreme Court held that because the statute overrode the employee's Fifth Amendment privilege against self-incrimination, the state could not constitutionally use the employee's grand jury testimony to impeach him at his ensuing criminal trial.[29] The Judiciary Committee's citation of *Portash,* for the proposition that Section 16–1002(c) similarly prevents use of a respondent's CPO hearing testimony for impeachment purposes in a criminal trial, indicates that the scope of the derivative use immunity provided by Section 16–1002(c) is likewise to be determined by reference to the requirements of the Fifth Amendment.

The Supreme Court addressed those requirements more fully when it upheld the constitutionality of the federal use immunity statute in *Kastigar.*[30] The federal statute, 18 U.S.C. § 6002, provides that a witness who has asserted his Fifth Amendment privilege may be ordered to

**27.** *Id.*

**28.** *Portash,* 440 U.S. at 452 n. 1, 99 S.Ct. 1292.

**29.** *Id.* at 459–60, 99 S.Ct. 1292 ("Testimony given in response to a grant of legislative immunity is the essence of coerced testimony.... The Superior Court of New Jersey,

Appellate Division, correctly ruled that a person's testimony before a grand jury under a grant of immunity cannot constitutionally be used to impeach him when he is a defendant in a later criminal trial.").

**30.** *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

testify, on the condition that "no testimony or other information compelled under the order (or any information *directly or indirectly derived from such testimony* or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order" [31] (emphasis added). The Court held the statute constitutional because the protection it grants against direct and derivative use of compelled testimony is "coextensive" with the protection furnished by the privilege against self-incrimination.[32] "It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." [33] In other words, the immunity from use and derivative use is an adequate substitute for the privilege because it "leaves the witness and the [government] in substantially the same position as if the witness had claimed his privilege in the absence of a grant of immunity." [34]

■ Unlike the federal use immunity statute, D.C.Code § 16–1002(c) does not purport to authorize the government (or a private party) to secure court orders to compel a respondent to testify over invocation of his privilege against self-incrimination. The respondent who chooses to testify in his own defense at a CPO hearing is not compelled to do so within the meaning of the Fifth Amendment. But the purpose of Section 16–1002(c) is similar to that of the federal immunity statute—to enable (if not to compel) witnesses to testify (in CPO hearings) without losing, in effect, the benefits of the privilege against self-incrimination. As implied in the legislative history of the statute, we therefore think the term "fruits" in Section 16–1002(c) must be construed to mean what *Kastigar* said would be necessary to accomplish that purpose: "fruits" must encompass any evidence "directly or indirectly derived from" the respondent's CPO hearing testimony.[35] Although the government on appeal professes some doubt about the scope of the term "fruits," it does not propose an alternative construction, and no other construction commends itself to us in this context.[36] At least insofar as evidentiary use in a criminal trial is concerned, we understand Section 16–1002(c) to grant protection that is fully "coextensive" with the privilege against self-incrimination.[37]

31. 18 U.S.C. § 6002 (2008).

32. *Kastigar, supra* note 30, 406 U.S. at 453, 92 S.Ct. 1653.

33. *Id.*

34. *Id.* at 458–59, 92 S.Ct. 1653 (internal quotation marks and citation omitted).

35. *Id.* at 453, 92 S.Ct. 1653.

36. The term "fruits" may have a different scope in other contexts, such as where the Fourth Amendment exclusionary rule is involved. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 477–78, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' ") (citation omitted).

37. In other respects, Section 16–1002(c) may not provide the same protection as the federal immunity statute or the privilege against self-incrimination. While 18 U.S.C. § 6002 prohibits use and derivative use of the immunized testimony "in any criminal case," Section 16–1002(c) provides only that the respondent's testimony and its fruits "shall be inadmissible as evidence in a criminal trial." Arguably, the latter language means that a re-

The Supreme Court also held in *Kastigar* that a defendant "need only show that he testified under a grant of immunity" to require the government to bear "the burden of showing that [its] evidence is not tainted by establishing that [it] had an independent, legitimate source for the disputed evidence."[38] The Court intended that this "heavy" burden of proof would afford "very substantial protection, commensurate with that resulting from the privilege itself."[39] For example, the Court emphasized, the "total prohibition on use" bars the use of immunized testimony "as an investigatory lead," and also bars "the use of any evidence obtained by focusing investigation on a witness as a result of" such testimony.[40] Lower courts have heeded *Kastigar's* words. For example, the United States Court of Appeals for the District of Columbia Circuit has held that "a prohibited 'use' occurs if a witness's recollection is refreshed by exposure to the defendant's immunized testimony, or if his testimony is in any way 'shaped, altered,

or affected,' by such exposure"[41]—"even where the witness testifies from personal knowledge,"[42] and "regardless of the prosecutor's 'fault.'"[43] Thus, "[i]t simply does not follow that insulating prosecutors from exposure automatically proves that immunized testimony was not used against the defendant. *Kastigar* is instead violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony regardless of *how or by whom* he was exposed to that compelled testimony."[44]

■ "A trial court must normally hold a hearing (a '*Kastigar* hearing') for the purpose of allowing the government to demonstrate that it obtained all of the evidence it proposes to use from sources independent of the compelled testimony."[45] A defendant may have to make a threshold showing of the possibility of taint in order to get a hearing, but as *Kastigar* makes clear, the showing re-

spondent's CPO hearing testimony and derivative evidence may be presented to the grand jury, for example. If it may, which we do not decide, then Section 16–1002(c) would not provide protection fully "coextensive" with the Fifth Amendment privilege.

**38.** *Kastigar, supra* note 30, 406 U.S. at 460, 461, 92 S.Ct. 1653; *see also United States v. Hubbell,* 530 U.S. 27, 40, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000).

**39.** *Kastigar, supra* note 30, 406 U.S. at 461, 92 S.Ct. 1653. The adjective "heavy" refers to the difficulty of proving a negative, not the standard of proof. "Most courts following *Kastigar* have imposed a 'preponderance of the evidence' evidentiary burden on the government." *United States v. North,* 285 U.S.App. D.C. 343, 354, 910 F.2d 843, 854 (1990) (*North I*), *opinion withdrawn and superseded in part,* 287 U.S.App. D.C. 146, 920 F.2d 940 (1990) (*North II*) (citation omitted). *See, e.g., United States v. Schmidgall,* 25 F.3d 1523, 1528 (11th Cir.1994) (citations omitted).

**40.** *Kastigar, supra* note 30, 406 U.S. at 460, 92 S.Ct. 1653.

**41.** *United States v. Poindexter,* 292 U.S.App. D.C. 389, 393, 951 F.2d 369, 373 (1991) (quoting *North I, supra* note 39, 910 F.2d at 860–61, 863). *Accord Schmidgall, supra* note 39, 25 F.3d at 1528. *See also United States v. Hylton,* 352 U.S.App. D.C. 332, 336, 294 F.3d 130, 134 (2002) (stating that if government induced co-conspirator to testify against defendant by confronting him with defendant's immunized statements, "[i]t seems to us rather obvious" that co-conspirator's testimony was "impermissible," even if the government already knew of the co-conspirator's role).

**42.** *North II, supra* note 39, 287 U.S.App. D.C. at 148, 920 F.2d at 942.

**43.** *Id.*

**44.** *Id.* (emphasis in original).

**45.** *North I, supra* note 39, 285 U.S.App. D.C. at 354, 910 F.2d at 854 (citations omitted).

quired is minimal; a credible proffer that prosecution witnesses may have been exposed to the immunized testimony is plainly enough. Ordinarily, the hearing should be conducted before trial, so that tainted evidence is excluded. But "[w]henever the hearing is held, the failure of the government to meet its burden can have most drastic consequences.... [I]f the tainted evidence was presented to the grand jury, the indictment will be dismissed; [46] when tainted evidence is introduced at trial, the defendant is entitled to a new trial." [47] However, "[d]ismissal of the indictment or vacation of the conviction is not necessary where the use is found to be harmless beyond a reasonable doubt." [48]

The government argues that appellant would not have been entitled to a *Kastigar* hearing in this case, either because Section 16–1002(c) does not contemplate one, or because appellant was not compelled to testify at the CPO hearing over invocation of his Fifth Amendment privilege, on penalty of being held in contempt.[49] Neither argument is tenable.

"The reasoning in *Kastigar* is not confined to cases arising under [the federal immunity] statute." [50] Indeed, the requirements of *Kastigar* have been applied to information given by defendants to government agents in exchange for informal (*i.e.*, non-statutory) promises of immunity,[51] and to testimony covered by statutory grants of blanket immunity.[52] A *Kastigar* hearing, in which the government must establish that its evidence is not derived from the defendant's immunized testimony, is virtually the only way the defendant effectively can enforce his right to immunity. The government knows what evidence it intends to offer and how it obtained that evidence; it should know whether its evidence is tainted. Inasmuch as D.C.Code § 16–1002(c) unambiguously grants deriva-

---

**46.** *But see supra* note 37.

**47.** *North I, supra* note 39, 285 U.S.App. D.C. at 354, 910 F.2d at 854 (internal brackets, quotation marks and citation omitted).

**48.** *Id.* (citations omitted).

**49.** This case does not call upon us to decide whether Section 16–1002(c), by itself, enables a court to compel a respondent to testify over a claim of Fifth Amendment privilege, on the premise that the respondent would be protected by operation of the statute from prosecution use of his testimony. No such authority has been claimed or exercised. Clearly, however, if the statute does not provide use immunity fully coextensive with the protections of the Fifth Amendment, see *supra* note 37, the respondent cannot be compelled to testify at the CPO hearing over a valid invocation of the privilege. *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 254, 261, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983) ("The power to compel testimony is limited by the Fifth Amendment, and we held [in *Kastigar*] that any grant of immunity must be coextensive with the privilege.").

**50.** *Hylton, supra* note 41, 352 U.S.App. D.C. at 336 n. 4, 294 F.3d at 134 n. 4 (citing *United*

States v. Kilroy*, 307 U.S.App. D.C. 229, 235, 27 F.3d 679, 685 (1994)).

**51.** In *Hylton* and *Kilroy, supra* notes 41 and 50, the United States Court of Appeals for the District of Columbia Circuit applied the requirements of *Kastigar* to witness debriefing statements that were not compelled pursuant to 18 U.S.C. § 6002 or otherwise, but that were covered by non-statutory governmental promises of immunity. In *United States v. Warren*, 373 A.2d 874 (D.C.1977), we similarly upheld the trial court's application of *Kastigar* to an indictment based on information the defendant provided in debriefings by government agents pursuant to a promise of immunity. *See also, e.g., United States v. Williams*, 817 F.2d 1136, 1138 (5th Cir.1987) (*Kastigar* applicable where defendant "talked to the DEA under an informal grant of use immunity").

**52.** *See, e.g., United States v. McDaniel*, 482 F.2d 305, 310–11 (8th Cir.1973) (*Kastigar* protections triggered by state statute conferring automatic immunity on all persons called to testify before state grand jury).

tive use immunity to any respondent for his testimony in a CPO hearing, we see no basis for exempting the criminal prosecution of such a respondent from the dictates of *Kastigar*—including *Kastigar's* allocation of the burden of persuasion. The government simply ignores the plain language of the statute when it suggests there is "no indication" that the Council of the District of Columbia "intended to impose a *Kastigar*-type burden on the government" when it enacted Section 16–1002(c). The imposition of such a "burden" is precisely what is implied by the grant of the right to derivative use immunity.

Furthermore, a *Kastigar* hearing is equally necessary whether the respondent testified in the CPO hearing voluntarily or under compulsion, because Section 16–1002(c) flatly forbids the evidentiary use of a respondent's CPO hearing testimony or its fruits in a criminal trial in either case. We have no authority to conjure up an exception to the express statutory command and drastically limit its effective scope to compelled testimony, as the government proposes. Moreover, engrafting such a limitation on Section 16–1002(c) would conflict with the general rule that a defendant who furnishes information under a promise of immunity is entitled to the benefits of that promise even if he does

so voluntarily without first asserting his privilege to remain silent.[53] As we stated in *Warren,* "[a]lthough technically [such a defendant] was not 'compelled to testify,' it is a constitutional principle of long standing that evidence of guilt induced from a person under a governmental promise of immunity must be excluded under the Self–Incrimination Clause of the Fifth Amendment."[54]

The only support the government has mustered for its suggestion that the protections of Section 16–1002(c) apply only to compelled testimony is the last sentence in the excerpt from the Judiciary Committee report quoted *supra:* "Moreover, section 3 provides that so long as the respondent is compelled to testify at a civil hearing, any statement made there cannot be used in a criminal trial (except for perjury or false statement), even for impeachment purposes."[55] The government contends this sentence shows that the Council meant to provide immunity only when a respondent asserting his Fifth Amendment privilege against self-incrimination is ordered to testify in a CPO hearing or be held in contempt.

■ We are not persuaded. We will not disregard a clear statutory command on the basis of an isolated, ambiguous comment in the legislative history.[56] The

---

**53.** *See United States v. Monia,* 317 U.S. 424, 430, 63 S.Ct. 409, 87 L.Ed. 376 (1943) (holding grand jury witnesses entitled to automatic immunity from prosecution provided by Sherman Act even though they did not claim their privilege against self-incrimination before testifying); *see also McDaniel, supra* note 52, 482 F.2d at 310–11 (defendant held entitled to *Kastigar* protections for voluntary grand jury testimony covered by state immunity statute).

**54.** *Warren, supra* note 51, 373 A.2d at 877 (citation omitted). Due process considerations reinforce this principle. *See id.,* citing *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), and *Braxton v. United States,* 328 A.2d 385 (D.C.1974), cases

concerning enforcement of agreements made by the government in plea bargaining. *See also Roye v. United States,* 772 A.2d 837, 841 (D.C.2001) ("[D]ue process of law demands that 'when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.' ") (quoting *Santobello,* 404 U.S. at 262, 92 S.Ct. 495).

**55.** Judiciary Committee Report, *supra* note 26.

**56.** Normally "[i]n interpreting a statute, we first look to the plain meaning of its language,

government's reading of the cited sentence is inconsistent not only with the plain language of the statute, but also with the rest of the Judiciary Committee report. The Council would have written a very different statute had it intended to authorize the Superior Court to compel respondents to testify at CPO hearings (presumably at the behest of the complainant, as an exercise of judicial discretion) via grants of use immunity, while withholding such immunity from respondents who testify voluntarily.[57] There is no discussion in the Judiciary Committee report of compelling respondents to testify. We think the only reasonable reading of the sentence on which the government relies is that it employs the term "compelled" in a non-technical sense, to refer to any respondent who feels obliged to take the witness stand in a CPO hearing to defend himself, whether or not he is ordered to do so over his invocation of the Fifth Amendment. The evident purpose of the sentence, which begins "Moreover," is not to announce a previously-unstated limitation on the broad new prohibition against derivative use, but merely to confirm that the prohibition extends to use for impeachment.

We conclude that appellant would have been entitled to a *Kastigar* hearing to put the government to its burden of proving that its evidence at trial was not tainted by his immunized CPO hearing testimony.[58] We now turn to consider whether appellant alleged sufficient facts to require a hearing on his claim that defense counsel was ineffective in failing to request a *Kastigar* hearing.

## 2. Defense Counsel's Alleged Ineffectiveness

■ Defense counsel knew or should have known that the complainant and the lead detective had been privy to appellant's immunized testimony, and that their exposure might taint their forthcoming testimony or other prosecution evidence at trial. If the government, put to the test, could not prove otherwise, appellant would have been entitled to substantial relief— e.g., exclusion of evidence at trial. The government might have been obliged to abort appellant's prosecution. Furthermore, as the record stands, it does not appear that counsel had a tactical reason to forego a *Kastigar* hearing. We have difficulty imagining such a reason. As the court said in *Hylton*, "[p]utting the government to its burden ... was, so to speak, a freebie; it cost the defense nothing and the possible benefit ... was undoubtedly significant."[59] The *Hylton* court

and if it is clear and unambiguous and will not produce an absurd result, we will look no further." *Beaner v. United States*, 845 A.2d 525, 534 (D.C.2004) (internal quotation marks and citation omitted). We certainly "must give effect to the plain meaning of the statute without reference to the legislative history" when that history is "ambiguous and inconsistent." *Tibbs v. United States*, 507 A.2d 141, 144 n. 2 (D.C.1986) (citation omitted).

57. Compare D.C.CODE § 16–1005(b) (2001 & Supp.2008), which explicitly provides that testimony may be compelled in a CPO hearing over invocation of a marital privilege:
(b) Notwithstanding section 14–306, in a hearing under this section, one spouse shall

be a competent and compellable witness against the other and may testify as to confidential communications, but testimony compelled over a claim of a privilege conferred by such section shall be inadmissible in evidence in a criminal trial over the objection of a spouse entitled to claim that privilege.

58. We express no view on whether the government also would have been required to prove that its evidence before the grand jury was untainted. See *supra* note 37.

59. *Hylton, supra* note 41, 352 U.S.App. D.C. at 336, 294 F.3d at 134.

held trial counsel's unjustified failure to raise *Kastigar* in that case to be "simply inexcusable." [60] Unlike in the present case, a post-trial evidentiary hearing on the ineffectiveness claim was held in *Hylton.* The hearing revealed that counsel's "decision was not a tactical one but instead rested on a misunderstanding of *Kastigar.*" [61] At the present stage of this case, we need only say that appellant has made a more-than-colorable showing of deficient performance.

■ We give short shrift to the government's argument that trial counsel "can hardly be deemed deficient for failing to request a *Kastigar* hearing when there is no case law or settled practice to establish her obligation to have done so" *in this specific context,* i.e., "when a criminal defendant has testified at a CPO hearing." Appellee's Brief at 45. [62] That is looking at the question too narrowly. A competent criminal defense attorney must be able to apply fundamental principles to new fact situations. As *Hylton* illustrates, whatever the specific circumstances, any defense attorney should appreciate that the prosecution must not use a defendant's immunized testimony or derivative evidence against him. The attorney's ignorance of Section 16–1002(c) or *Kastigar* is no ex-

cuse for doing nothing to protect the defendant from such use.

Appellant's allegations also show a sufficient likelihood of prejudice at trial—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" [63]—to warrant a hearing on his claim of ineffectiveness. On this score, it is enough to point out that Parker and the lead detective were exposed to appellant's immunized testimony. The allocation of the burden of persuasion at a *Kastigar* hearing means appellant's entitlement to relief is presumed unless the government proves the absence of taint and the independent derivation of its evidence. The government's ability to "surmount such a difficult obstacle" [64] in this case is doubtful, and "we may not infer findings favorable to it." [65] The prosecutor's affidavit does not dispose of the matter: "[a] government agent's denials that he made use of the immunized testimony, standing alone, are generally insufficient to meet the government's burden." [66] The prosecutor's good faith, which appellant has not questioned, is "beside the point" if the prosecution nonetheless was tainted by the use of his immunized testimony. [67]

That Parker's trial testimony may have been generally consistent with her testimo-

60. *Id.*

61. *Id.*

62. The government notes that there have been no reported decisions applying *Kastigar* to D.C.Code § 16–1002(c), a statute in effect since 1982. "Further," it asserts, "we do not understand that it is the practice in this jurisdiction to request a *Kastigar* hearing when a criminal defendant has testified at a CPO hearing." Appellee's Brief at 45. Of course, the record before us is silent on the latter subject, and we are in no position to determine what the practice in this jurisdiction has been, or—if the government's understanding

is correct—why hearings have not been requested.

63. *Strickland, supra* note 24, 466 U.S. at 694, 104 S.Ct. 2052.

64. Appellee's Brief at 43.

65. *United States v. Rinaldi,* 257 U.S.App. D.C. 298, 302, 808 F.2d 1579, 1583 (1987) (citation omitted).

66. *Schmidgall, supra* note 39, 25 F.3d at 1528 (citation omitted).

67. *United States v. Hsia,* 131 F.Supp.2d 195, 201 (D.D.C.2001) (citations omitted).

ny before she listened to appellant [68] does not prove her later testimony was not affected more subtly, but nonetheless materially, by her reaction to what he said. Parker was not examined in the grand jury or at trial about the influence on her of appellant's immunized testimony.[69] It appears the government took no steps to prevent, cabin, or discover such influence, for the prosecutor averred that she did not speak with Parker about the CPO hearing when she prepared appellant's case for indictment and trial. Similarly, the government has not proved that its investigation was unaffected by appellant's immunized testimony. Appellant suggests that David Brox may have become a prosecution witness because Detective Montague or Parker heard appellant at the CPO hearing attribute some of Parker's harassment to Brox's enemies. On the present record, it is not clear how the government identified Brox as a potential witness, or whether it did so prior to the CPO hearing.

Finally, it cannot be said at this stage that any use of appellant's immunized testimony or derivative evidence at trial was harmless beyond a reasonable doubt in light of the strength of the government's case against appellant. We do not yet know what, if any, evidence in the government's case should have been excluded. To answer that critical question, an evidentiary hearing is required on appellant's *Kastigar* claim.

## B. Counsel's Failure to Obtain Parker's CPO Hearing Testimony

■ We have no doubt that appellant's second claim of ineffectiveness sufficiently alleges deficient performance. Defense counsel had an undoubted duty to investigate the complainant's allegations and the possibility of impeaching her.[70] Counsel's duty to conduct a reasonably thorough investigation presumptively would have obliged her to obtain and review the readily available transcript of Parker's testimony at the CPO hearing, which previewed much of her testimony at trial.[71] No justification has been offered for counsel's failure in this regard.

. The ineffectiveness claim founders, however, on appellant's inability to plead prejudice with requisite particularity. We see no reasonable probability that the outcome of the trial would have been different had defense counsel obtained Parker's testimony from the CPO hearing.

Appellant's main claim of prejudice is that his counsel lost the opportunity to impeach Parker's trial testimony. He

---

**68.** As we discuss *infra,* however, appellant points to at least one difference-Parker did not testify about appellant's March 13 threat at the CPO hearing. At a *Kastigar* hearing, the government would have to prove that any changes in Parker's testimony were independent of her exposure to appellant's immunized testimony

**69.** As the *Hylton* court explained,

the *Kastigar* hearing and the examination of witnesses at trial have two entirely different functions. At trial both counsel are concentrating on the substance of the witnesses' testimony, but at a *Kastigar* hearing the focus is more narrow, not whether the

witness is generally telling the truth but, instead, was he or she influenced by the immunized testimony. Such a hearing obviously must take place outside the jury's presence.

*Hylton, supra* note 41, 352 U.S.App. D.C. at 336, 294 F.3d at 134.

**70.** *See Cosio v. United States,* 927 A.2d 1106, 1127–28 (D.C.2007) (en banc) (citations omitted).

**71.** We here consider whether counsel's failure to obtain Parker's CPO hearing testimony was ineffective for reasons apart from the obvious relevance of that testimony to a proper evaluation of appellant's *Kastigar* claim.

identifies only one respect in which impeachment might have been possible. At trial, as in the grand jury, the prosecutor specifically asked Parker whether she had any contact with appellant on March 13, two days after he assaulted her. Parker answered that appellant called her on the phone that day and said, "Bitch, if I go to jail, I'm going to fuck you up." This was the factual basis for one of the threats counts in the indictment. Appellant argues that defense counsel could have impeached Parker with her failure to mention the March 13 threat when she testified at the CPO hearing. But an attempt to impeach Parker with that omission would have accomplished little, in our view. At the CPO hearing, Parker was not asked about her March 13 contact with appellant. While Parker *was* asked—at the CPO hearing and at trial—why she did not appear for appellant's first assault trial, on neither occasion did she claim that appellant's threat dissuaded her. Rather, while Parker insisted at trial that she was afraid of appellant, she consistently explained that the reason she did not come to court was that she never received a notice to do so. Moreover, if defense counsel had impeached Parker with her omission at the CPO hearing, the government could have rehabilitated her and refuted the defense suggestion that she fabricated the March 13 threat in response to appellant's testimony. As appellant concedes, it is a matter of record that Parker reported the March 13 threat when she met with a victim/witness advocate in the United States Attorney's Office on September 12, 2000—two weeks *before* Parker heard appellant testify at the CPO hearing.[72]

Appellant also argues that defense counsel's unfamiliarity with the CPO hearing testimony resulted in her being surprised by Parker's insistence at trial that her relationship with appellant ended in March. It is clear enough from the *Monroe–Farrell* inquiry that counsel indeed was surprised by this testimony. But appellant does not show that counsel's unpreparedness on this point made any difference to the outcome of the trial. Appellant's new trial motion proffers no testimony or other evidence that counsel could have obtained to contradict Parker—nothing, most strikingly, from appellant's mother or the day care personnel who were discussed in this connection before trial. While defense counsel might have questioned Parker and appellant somewhat differently about their relationship had she been better prepared, appellant does not describe any line of questioning that would have been more effective in the end. We see no reasonable likelihood that a difference in counsel's treatment of this essentially tangential issue would have changed the result of appellant's trial.

### IV.

We remand this case for a hearing on appellant's *Kastigar* claim. In all other respects, we affirm the rulings of the trial court.

*So Ordered.*

---

72. It is true that Parker did not report the March 13 threat until long after it occurred, but defense counsel did not need the transcript of her CPO hearing testimony to impeach her credibility with that fact.